1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4    THE HONORABLE GEORGE H. KING, UNITED STATES DISTRICT JUDGE

5

6    MARK BERGER, ET AL.,            )
                                     )
7                    PLAINTIFFS,     )
                                     )
8            vs.                     )   NO. CV 05-5373-GHK (Cwx)
                                     )
9    PROPERTY I.D. CORPORATION, ET AL., )   HEARING RE MOTION
                                     )
10                   DEFENDANTS.     )
     _____)

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              LOS ANGELES, CALIFORNIA

17         MONDAY, JANUARY 26, 2009; 9:38 A.M.

18

19

20

21

22

23                    MARY RIORDAN RICKEY, CSR NO. 11252
24                    255 EAST TEMPLE STREET, ROOM 181-G
                      LOS ANGELES, CALIFORNIA  90012
25                    MARY.USDC@YAHOO.COM

1    APPEARANCES OF COUNSEL:

2        FOR PLAINTIFFS:

3            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
             BY:  BARRY R. HIMMELSTEIN, ESQ.
4            EMBARCADERO CENTER WEST
             275 BATTERY STREET
5            THIRTIETH FLOOR
             SAN FRANCISCO, CALIFORNIA  94111-3339
6            (415) 956-1000

7
         FOR OBJECTOR MR. ALFI:
8
             LAW OFFICES OF HOWARD STRONG
9            BY:  HOWARD STRONG, ESQ.
             POSTAL BOX 570092
10           TARZANA, CALIFORNIA  91357-0092
             (818) 343-4434
11

12       FOR PROPERTY I.D. CORPORATION DEFENDANTS:

13           ALSTON & BIRD, LLP
             BY:  ANDREW M. GILFORD, PARTNER
14           333 SOUTH HOPE STREET
             SIXTEENTH FLOOR
15           LOS ANGELES, CALIFORNIA  90071
             (213) 576-1000
16

17       FOR REALOGY CORPORATION DEFENDANTS:

18           SUSSMAN SHANK, LLP
             BY:  JOHN A. SCHWIMMER, ESQ.
19           1000 SOUTHWEST BROADWAY
             SUITE 1400
20           PORTLAND, OREGON  97205
             (503) 227-1111
21
         FOR PICKFORD REALTY DEFENDANTS:
22
             SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
23           BY:  KENNETH A. O'BRIEN, JR., ESQ.
             333 SOUTH HOPE STREET
24           FORTY-EIGHTH FLOOR
             LOS ANGELES, CALIFORNIA  90071-1448
25           (213) 620-1780

```
1    APPEARANCES OF COUNSEL:

2
         FOR PICKFORD REALTY DEFENDANTS:
3
              BARNES & THORNBURG, LLP
4             BY:  ROBERT D. MACGILL, ESQ.
                   KAROLINE E. JACKSON, ESQ.
5             11 SOUTH MERIDIAN STREET
              INDIANAPOLIS, INDIANA  46204-3535
6             (317) 236-1313

7
         FOR DEFENDANTS R.O.C.H. ENTERPRISES, INC., FORMERLY KNOWN
8        AS RE/MAX OF CALIFORNIA AND HAWAII, INC.:

9             SPIERER, WOODWARD, CORBALIS & GOLDBERG, APC
              BY:  STEVEN F. SPIERER, ESQ.
10            707 TORRANCE BOULEVARD
              SUITE 200
11            REDONDO BEACH, CALIFORNIA  90277-3400
              (310) 540-3199
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1           LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 26, 2009

 2                             9:38 A.M.

 3                              -oOo-

 4           THE CLERK:  Calling Item No. 1 on the Court's

 5   calendar, Civil 05-5373.  Mark Berger, et al., versus Property

 6   I.D. Corporation, et al.

 7           Counsel, would you please state your appearances for

 8   the record.

 9           MR. HIMMELSTEIN:  Good morning, Your Honor.

10   Barry Himmelstein of Lieff, Cabraser, Heimann and Bernstein for

11   the plaintiffs.

12           THE COURT:  Yes, good morning.

13           MR. STRONG:  Good morning, Your Honor.  Howard

14   Strong, Law Offices of Howard Strong for Objector Alfi.

15           THE COURT:  Yes, good morning.

16           MR. GILFORD:  Good morning, Your Honor.  Andrew

17   Gilford of Alston and Bird on behalf of the Property I.D.

18   defendants.

19           THE COURT:  Good morning.

20           MR. SCHWIMMER:  Good morning, Your Honor.  John

21   Schwimmer of Sussman Shank for the Realogy defendants.

22           THE COURT:  Good morning.

23           MR. O'BRIEN:  Good morning, Your Honor.

24   Kenneth O'Brien of Sheppard Mullin for the Pickford

25   defendants.
```

```
 1              THE COURT:  Good morning.

 2              MR. MACGILL:  Robert MacGill, Your Honor, on behalf

 3    of the Pickford defendants.

 4              THE COURT:  Yes, good morning.

 5              MS. JACKSON:  Karoline Jackson, also on behalf of the

 6    Pickford defendants.

 7              THE COURT:  All right.  Good morning.

 8              MS. JACKSON:  Good morning.

 9              MR. SPIERER:  Good morning, Your Honor.  Steven

10    Spierer of Spierer, Woodward, Corbalis and Goldberg on behalf

11    of R.O.C.H. Enterprises, Inc., formerly known as RE/MAX of

12    California and Hawaii.

13              THE COURT:  Yes, good morning.  All right.

14              There was another objector, and that's

15    Mr. Joseph Darrell Palmer.  Evidently he is not here.

16              MR. HIMMELSTEIN:  We have not seen him, Your Honor.

17              THE COURT:  Okay.  And there was another individual

18    by the name of Juana Peraza, and I'm not sure whether that was

19    really an objection because, as I took a closer look at it, it

20    appears as though maybe what she was saying was that she was

21    intending to appear in this case, not that she's intending to

22    appear at the hearing to object.

23              I don't remember seeing the word "objection" anywhere

24    on that Notice of Intention.  I suspect it may have been

25    intended as a claim.
```

```
 1              Have you taken a look into that, Mr. Himmelstein?
 2              MR. HIMMELSTEIN:  I have looked at the document,
 3    Your Honor.  I deal with this a lot.  And when you send out
 4    250,000 notices, there are obviously some people who won't
 5    exactly understand what the procedures are.
 6              So it's not unusual to have a class member file
 7    something like that just because they think they see that it's
 8    something that can be done but without much appreciation of the
 9    particular significance.  I'm not surprised we don't see more.
10              THE COURT:  Mr. Himmelstein, why don't you go ahead
11    and approach the lecturn.
12              I have some preliminary questions for you.  I have
13    some more substantive clarifications of the settlement that I
14    want to talk to you about.
15              And then, Mr. Strong, I will hear from you after
16    that, if you have anything further to add on behalf of
17    Mr. Alfi.  And then I'll make my rulings in this case.
18              Okay.  So Mr. Himmelstein, why don't you go ahead
19    and, first, preliminary questions.
20              MR. HIMMELSTEIN:  Yes, Your Honor.
21              THE COURT:  One, from the latest filing that I have
22    received from you, which I think is sometime earlier in
23    January, I believe there's a supplemental follow-up declaration
24    from the claims administrator saying that, as of that time,
25    there were then 24 requests for exclusion.
```

```
 1              Is that where we stand?

 2              MR. HIMMELSTEIN:  Yes, Your Honor.  That number has

 3   not changed.  That is all of the timely requests, and there

 4   have been no untimely requests.

 5              THE COURT:  I was only aware of two objections, one

 6   by Mr. Alfi one by Mr. Palmer.

 7              I have, of course, considered both of those

 8   objections, and I'm going to hear from Mr. Strong in a few

 9   minutes on behalf of Mr. Alfi.  Mr. Palmer has chosen not to be

10   here.  So I won't be able to hear from him.

11              We talked about this Notice of Intent from Juana

12   Peraza.  Other than that, have you since received any further

13   either timely or untimely objections to the settlement?

14              MR. HIMMELSTEIN:  No, Your Honor.

15              THE COURT:  Okay.  Now, let me talk about a couple of

16   substantive questions that I have, and I have basically three

17   of them.

18              One is:  Although sometimes the inclination is to

19   talk about it as if this is one big class action settlement,

20   there are really three settlements of three separate classes.

21              I think it's important to look at it separately

22   because, in this case, there's not going to be any

23   interchangeability within the three classes.

24              The three classes are stand-alone classes; so the

25   money is not going to be:  Well, we don't have quite enough for
```

1    class two.  So we'll borrow some from class one because they've

2    got too much money before reversion or something.  That can't

3    happen.

4             So you said something about the claims rate would

5    have to be around 73 percent for there to be any need to resort

6    to pro-rata payments for any of the potential class members of

7    any of these classes;

8             And you didn't specifically say whether or not that

9    73 percent is if we were to look at all three classes together

10   or it's a figure that's applicable even if we look at it one

11   class at a time.

12            So I want you to clarify for me there.

13            MR. HIMMELSTEIN:  Certainly.

14            THE COURT:  I mean, 73 percent obviously is an

15   extraordinary high rate of claims in most of our experience, I

16   would say; and we can probably safely say it's unlikely, though

17   it's never impossible, but it's highly unlikely.

18            But we do have certain classes and, for instance, the

19   RE/MAX class which does not include a reverter but,

20   nevertheless, is of more circumscribed amount of total money in

21   settlement.

22            I want to know whether you believe that an

23   extraordinarily high percentage of claims would still have to

24   occur as to each individual class before pro-rata sharing will

25   be required.

1          MR. HIMMELSTEIN:  Yes, Your Honor.  That was an

2   aggregate figure that I gave the Court.

3          THE COURT:  Is the microphone on?  I'm having a

4   little trouble hearing you.  Make sure it's on.  Speak closer

5   into it.

6          MR. HIMMELSTEIN:  Certainly, Your Honor.

7          That was an aggregate figure.  I think we used

8   75 percent in the brief because notice and claims

9   administration costs are in there, but I don't think that would

10  be a significant share of the total.

11         That is an accurate figure for both the Realogy and

12  the Pickford classes because they are contributing, basically,

13  or willing to fund up to the full amount of revenues that they

14  received.  So, basically, everybody can have their money back

15  from Realogy or the Pickford classes except for whatever would

16  be allowed for attorney's fees.  And if there was a 25-percent

17  fee, that's where I get the 75-percent claims rate.

18         It is true for RE/MAX --

19         THE COURT:  Of course, it wouldn't be 75 percent

20  because if there is a 75-percent fee -- we're not talking about

21  claims administration fees yet.  But I'm going to talk to you

22  about how much likely that's going to be because I don't think

23  I have any kind of an estimate on that.  We'll talk about that

24  in a few moments.  I understand that.

25         Now, go to RE/MAX.

```
1           MR. HIMMELSTEIN:   RE/MAX is in a different situation.

2    The dollars there, I haven't done the exact math.  I could do

3    it before the hearing is over to tell you what that rate would

4    have to be.

5           It would probably be about half of the others before

6    there would be any sort of a cramdown.  So 37 percent,

7    something in there, before any sort of a cramdown.

8           As Your Honor noted however, there is no reversion

9    with respect to the RE/MAX class.  And I noted in our papers

10   that we faced a couple of additional layers of litigation with

11   respect to that class, and I need to add a third layer.

12          One of the principals who we would have to amend to

13   name as a defendant has now passed away unfortunately.  And so

14   we would have to prevail not only in adding them to the case at

15   this late stage in an alter-ego fight, which will be more

16   difficult with the witness no longer living, and then we would

17   have to chase the remaining assets of their estate.

18          So the number is lower for RE/MAX.  But as Your Honor

19   noted, there is no reversionary fund as to RE/MAX.

20          THE COURT:  Do you know from the claims administrator

21   of the 45,000-roughly plus or minus claims that have been

22   submitted to date, what would be the relative percentage of

23   those within the RE/MAX class?

24          MR. HIMMELSTEIN:  The claims administrator -- I have

25   asked for that information.  They have not processed the claims
```

 1   yet to have that information.  They were waiting for the Court

 2   to grant approval before processing the claims.

 3          I would assume, given the kind of numbers that we're

 4   dealing with here, the fact that the records which gave rise to

 5   the mailing lists were all maintained by the same company in

 6   the same way -- Property I.D. -- that the law of statistics

 7   would govern and things should average out on a pro-rata

 8   basis.

 9          That is what I would expect.

10          THE COURT:  Okay.  Second issue, the cost of

11   administration.

12          The cost of administration will be, in essence, an

13   additional layer between the absolute maximum contribution of

14   the Realogy and the Pickford defendants and the Property I.D.

15   defendants, of course, also -- to those two classes -- minus,

16   of course, whatever I grant in fees, costs, whatever.

17          Well, incentive is going to be included in the fees.

18          But there's an additional band for, of course, the

19   expenses of administration.

20          MR. HIMMELSTEIN:  Yes, Your Honor.

21          THE COURT:  Do you have some idea as to what we're

22   looking at?

23          Are we looking at hundreds of thousands of dollars,

24   or are we looking at millions of dollars?

25          MR. HIMMELSTEIN:  We received an estimate from the

```
 1    notice administrator, who we're asking to be appointed also as
 2    the claims administrator, of -- I believe the total was
 3    $1.3 million for both notice and claims administration, was the
 4    estimate that we received.
 5          THE COURT:  Estimate going forward total, including
 6    that which has yet to be done; that is, you know, processing
 7    claims, cutting checks, making the accounting to the Realogy
 8    and the Pickford defendants, and demanding whatever payment
 9    they still have to make in order for that, making the
10    allocation -- everything else.
11          MR. HIMMELSTEIN:  We got an estimate, and I'm now
12    recalling I think that did not include the publication notice,
13    which was approximately $300,000.
14          The total estimated administration expenses -- all
15    in, everything, complete -- was $1.3 million approximately.
16    And the cost of the notice was about $300,000 on top of that.
17          So about $1.6 million total to be divided, of course,
18    pro rata amongst the defendants pursuant to the settlement
19    agreement.
20          THE COURT:  Okay.  Now, the third issue that I have
21    is:  It's technically a misnomer to say there's a reverter
22    because it's not like the Realogy and the Pickford defendants
23    are putting the money up, and then the money gets reverted back
24    to them.
25          They are really not putting up all of the money.
```

 1    They put up part of the money then they promised or agreed that

 2    within 30 days after the administrator provides the accounting,

 3    which would be a reasonable time after the close of the claim

 4    deadline --

 5            So let's say, you know, roughly within 60 days after

 6    the claim deadline or so, then these two defendants would have

 7    to make up for whatever difference there may be, up to the

 8    maximum that they've agreed to.  Right?

 9            MR. HIMMELSTEIN:  Yes, Your Honor.

10            THE COURT:  Now, I don't know what the financial

11    conditions of these defendants are.  You know, if we were in a

12    different day, in a different time, I would say that's not

13    something I would want to give too much thought to.

14            But if there could be failures or threatened failures

15    of the type that you and I have been hearing about recently, it

16    seems like nobody is exempt from certain hardships and

17    particularly concerning this area because, if I take a look at

18    the total initial deposit --

19            My math may be off a little bit, and I don't think we

20    need to be precise to the dollar for purposes of our

21    discussion.

22            -- I have something around $12.048 million initial

23    deposit, all in.  That is, Realogy, Pickford, RE/MAX, including

24    the various contributions attributable to each of these classes

25    from Property I.D.

```
 1            But if you look at your proposed fee request --
 2   assuming for a moment that I grant you the fee that you want --
 3   the costs of litigation, some $360,000 plus or minus, not
 4   including the administrator at all because the administrator
 5   appears to be paid from the second wave of contributions that
 6   the defendants would be making with the exception I guess of --
 7            MR. HIMMELSTEIN:  The notice costs have been paid
 8   already.
 9            THE COURT:  So we're talking about a potential --
10            And if you assume 45,000 claims, a hundred dollars,
11   you know, 99 to 114.  Let's use an even number, a hundred
12   dollars per.  It comes out to roughly $14.3 million.
13            So going in, we know that if your fees are all paid
14   and your costs all paid, whatever is in the pot right now is
15   insufficient to pay even the claimants to date.
16            So my concern is what if -- let's see, there's 45
17   days or so, claims period to end plus, let's say, roughly 30 --
18   I don't know if that's even realistic in turnaround for the
19   accounting by the administrator, 30 days for them, the
20   defendants to produce the remainder of the money pursuant to
21   the accounting.
22            So that's 60 plus -- it's about 105 days or so from
23   now.  So you're talking about three and a half months from now.
24            What if, in three and a half months from now, these
25   two defendants defaulted?
```

```
 1              MR. HIMMELSTEIN:  Well, Your Honor, I have looked

 2   into their financial condition, and I have some exhibits I

 3   could hand up.  First of all, we're dealing with only two of

 4   the defendants.  Property I.D. and RE/MAX have contributed in

 5   full.

 6              THE COURT:  I understand.

 7              MR. HIMMELSTEIN:  Realogy is owned by the Apollo

 8   Group which. . . .

 9              If I may just get my documents.

10              THE COURT:  Yes.

11              MR. HIMMELSTEIN:  Which is doing actually quite well.

12              Despite the economic conditions, their stock is

13   trading very close to its 52-week high.  Their market cap is

14   $9 billion.  I don't remember the exact purchase price, but

15   during the course of this litigation, they paid, I believe,

16   it's several billion dollars for the Realogy Group.  It's their

17   primary business.

18              So this is a very large company which is actually

19   continuing to do all right.  And there was, you know, news on

20   C.N.N. this morning that the Realty Board has just released new

21   figures.  Sales of existing homes are back up 6 percent, and

22   they think maybe the corner has been turned.

23              If I could just provide this to Your Honor, the

24   Apollo Group financials.

25              THE COURT:  Yes, all right.
```

```
 1          MR. HIMMELSTEIN:  And this has also their financials,

 2   their cash position, et cetera.  It looks rather healthy.

 3          And then the second defendant, Pickford, is part of

 4   HomeServices America which a Berkshire Hathaway Company owned

 5   by Warren Buffett.

 6          So, yes, anything is possible.  Anyone can fail.  But

 7   these are two of the largest, most successful businesses in the

 8   real estate industry.

 9          I'm not particularly concerned about them failing.

10   And of course, if that were to happen, we would, you know, be

11   back here and returning attorney's fees and making whatever,

12   you know, appropriate adjustments the Court felt were

13   necessary.

14          THE COURT:  Here's really my question:

15          I think from what you tell me the chances are

16   probably good that in 105 days these two entities will probably

17   be able to pay up to the difference of what they could be owed

18   pursuant to this settlement agreement.  And I would say the

19   chances are probably good.

20          But as you said, there are no guarantees.  And given

21   what we have seen. . . .

22          I have seen other very, very, very substantial

23   companies -- and you know who they are -- a couple of months

24   before they were going to go under without government

25   assistance, some C.E.O. goes out there and says:  Golly, gee,
```

1   everything is wonderful and peachy and keen.  And then,

2   thereafter, but for a handout from the government, we were

3   going to see disaster, or at least that's what they tell us.

4          And so the real question is:  Who should take the

5   risk of that happening?

6          Should it be that you are confident that's happening,

7   but you don't have to worry about it because, if I do what you

8   ask me to do, you'll have all of your money in hand.  So you'll

9   run, effectively, no risk in that sense except that, if you

10  come back here, and then you may have to pay the money back and

11  unwind the transaction if it turns out the settlement has been

12  breached in material terms as to at least two of the classes;

13         Or should you bear part of the risk so that, at

14  least, we have a reasonable basis of concluding that the money

15  up front that's been paid will be enough to service a part of

16  your fees, but likely all or substantially all of likely claims

17  that might come in.

18         We don't know how many claims will come in.

19         When did the first mailing go out on the claims?

20         MR. HIMMELSTEIN:  I believe it was September 29.

21         THE COURT:  So it's been on a rolling basis from

22  September 29, roughly.  October, November, December, January,

23  roughly four months.  We have roughly two more months to go --

24  right? -- because March 27 is 60 more days.

25         MR. HIMMELSTEIN:  Yes, Your honor.

```
 1              THE COURT:  Okay.  60 more days to the cut-off.

 2          So let's say it's not going to be perfectly even in

 3   terms of the rate of claims coming in.  Maybe there might be a

 4   lot of claims first coming in upon notice, and then it will

 5   drop off.  And then those procrastinators might at the last

 6   minute say:  Golly, gee, the cut-off is coming up soon so let's

 7   get our claims in.  And so maybe there's a spike at the end.

 8              MR. HIMMELSTEIN:  That is exactly the pattern that's

 9   normally observed, Your Honor.

10              THE COURT:  Let's say that's what happens.  And maybe

11   let's say instead of 45,000, by the end of the day, we'll have

12   60,000.  I don't know.  I'm guessing.

13              MR. HIMMELSTEIN:  Yes, Your Honor.  I hope so.

14              THE COURT:  Sixty, sixty-five, whatever.

15          If we are at least comfortable that we have enough

16   money already collected so that everybody will be paid as to

17   these two classes, because I think maybe separate from real

18   estate, will be paid their $99 or $114 -- then you will get the

19   remainder of your fees, which part of it could be escrowed

20   right now so that, if there's any interest, it will come to you

21   as interest because if these people are actually, ultimately

22   good for it.

23          It's just a matter of accounting as to who gets

24   what.

25          At that point, money is money.
```

1          That might be something where the risk is not borne

2    all by the claimants, but it's also borne by you.

3          What do you think about that?

4          MR. HIMMELSTEIN:  Well, I hear the point, Your Honor.

5          I would never be in a position where I got paid in

6    full, and the class did not.  I would also expect conversely

7    not to be the only one taking the risk of insolvency -- the

8    class gets all their money, and I get stiffed after, you know,

9    a $4-million investment.

10         THE COURT:  I'm not suggesting you don't get paid

11   anything.  I'm just suggesting that perhaps instead of you

12   getting paid a hundred percent of your requested fees, whatever

13   it is that I may authorize, that you get a part of that and a

14   part of it in reserve.

15         MR. HIMMELSTEIN:  Your Honor, that's a reasonable

16   solution, if you have that much concern.

17         I guess I would say, though, that people are signing

18   settlement agreements everyday, hopefully, even in this

19   economy.  And they're proceeding forward, assuming that the

20   check will come and they'll get paid.

21         We face a lot of delays and obstacles to payment, a

22   couple more months isn't going to kill us.

23         I think Your Honor might have noticed, we put in our

24   papers we had $146 million in overhead since this case was

25   filed.  So it's a little bit different for me to wait three or

```
 1   four months than for a class member to wait three or four

 2   months for a hundred dollars they didn't know was coming.

 3            But if that's how Your Honor chooses to equitably

 4   resolve this concern, I certainly would not argue with

 5   Your Honor.

 6            THE COURT:  Okay.  Now, let me talk about the only

 7   other matter that I do want to talk to you about.  And then

 8   I'll give Mr. Strong an opportunity to talk about his

 9   objection, and I'll give you an opportunity to reply or any of

10   you folks who care to be heard on this, of course, I will hear

11   from you.

12            The only other area that I do want to talk to you

13   about is the area of the incentive.

14            Now, please understand that I understand the

15   practical realities of the incentive, how it's going to be

16   applied, where is it coming out of, is it going to make any

17   difference likely to any of the class members who are going to

18   be filing claims, so forth and so on.  I understand that.

19            But despite the understanding, I don't believe it is

20   my right to sort of ride rough-shod over the law because, at

21   the end, who cares because the claimants are likely still going

22   to get their hundred dollars.

23            Nevertheless, because I am sworn to uphold the law

24   and I have to do everything in accordance with it, I do want to

25   talk to you about it.
```

1          It's not clear to me:  Are you asking for $25,000

2    across the board for every one of these plaintiffs defined to

3    be Mr. and Mrs. Berger, Mr. Lee, Ms. Aldrich, Mr. Harvey,

4    Mr. Attar and Mr. Chenier?

5          I count seven.  Am I missing anybody?

6          MR. HIMMELSTEIN:  I don't believe so, Your Honor.

7          THE COURT:  Okay.  So are you asking, effectively,

8    across the board, a $25,000 incentive for every one of these

9    seven?

10         MR. HIMMELSTEIN:  I am, Your Honor.  And I'm asking

11   to be able to pay that out of what the Court determines we have

12   earned in the case.  That's how strongly I feel about it.

13         Normally, these are paid separately and don't come

14   out of the attorney's compensation.  The reason for that is

15   this is like no other case.

16         THE COURT:  Before you get into that --

17         MR. HIMMELSTEIN:  Okay.

18         THE COURT:  I understand that.  That's why I prefaced

19   my remark by saying I do have an appreciation of the somehow

20   odd situation that we're in.  "Odd" not in the normatively

21   judgmental sense, but just different, I should say, perspective

22   that we have.  You are saying:  Let it come out of the fees.

23         MR. HIMMELSTEIN:  Yes, Your Honor.

24         THE COURT:  So it's sort of an interesting situation

25   because if I say:  Gee, I don't know whether you've made a

1    sufficient showing and I don't know whether the law is such

2    that one or more of these people should be getting paid $25,000

3    or that maybe they all should not be getting twenty-five or

4    some lesser amount -- it's going to redound to your personal

5    benefit because that means it's less that you pay out of your

6    fees, whatever fees I approve.

7              I understand that.  That's why this is strange.

8              MR. HIMMELSTEIN:  Yes, Your Honor.

9              THE COURT:  But, nevertheless, just because you're

10   paying it out of your fees, doesn't mean that -- if I'm called

11   upon to prove it and I'm called upon to sign some paper that

12   says "This is a proper award to this person for incentive" --

13   that I don't have to make sure that it is proper; that it is

14   not only proper as a matter of fact, but is proper as a matter

15   of law.

16             Let's talk about law, first.  Okay.

17             I'm concerned with respect to the law on two of these

18   seven people.  I'm concerned about Chenier; I'm concerned about

19   Attar.

20             As to Mr. Attar, he's not a member of any class.  By

21   definition, he was not a member of the class of the RE/MAX;

22   hence he had to be substituted out and Mr. Harvey was

23   substituted in.  Unlike Chenier, he is not also a class member

24   of some other class that has been certified.

25             So he is not a class member, much less that he --

```
 1        (Ringing interruption in the proceedings.)

 2            THE COURT:  -- much less that he is not also a class

 3   plaintiff or representative.

 4            I don't know what would be the legal basis for making

 5   an award to him, other than that statement, that

 6   one-line statement that you cited to me from Stanton.

 7            In Stanton I have read the relevant portions multiple

 8   times to try to understand it.  As best as I can understand it,

 9   that sentence perhaps stands for the proposition that, if he

10   had incurred compensable costs so that you can otherwise

11   properly pay it as costs or pay it as fee, then you can do that

12   and I can authorize that.

13            But I don't know whether being a putative class

14   representative that turned out to be someone who couldn't have

15   been a class representative could be compensated for his time

16   and effort, maybe out-of-pocket expenses or whatever it is.

17            I'm not sure, and I don't think you've spent enough

18   time briefing that for me, for me to be comfortable in saying

19   Mr. Attar is entitled to anything.

20            That's not to say that, if there were a proper legal

21   basis for it; that's not to say that, if he hadn't retained his

22   position because of the timing of his claim or his transaction

23   as a class representative, that I would not be amenable to some

24   incentive award -- because I think his declaration clearly sets

25   forth things that suggest that it would certainly meet one or
```

1    more of the various nonexclusive elements or factors that I

2    would consider in determining whether, A, somebody should be

3    given an incentive award and, B, how much.

4           Mr. Chenier is a little bit different.  Mr. Chenier

5    was a member or a participant and a proposed class

6    representative of a class that the Court declined to certify,

7    the Mason-McDuffie.  So as to that, he can't get anything

8    because there is no class and there is no award to that class.

9           Now, I understand that you're telling me that

10   Mr. Chenier is, nevertheless, a class member of the Realogy

11   class.

12          And if he's a class member of the Realogy class, at

13   least, there's some authority which says that, if class members

14   do certain things which contribute to the class or help to

15   benefit the class -- whatever it is -- perhaps the Court can

16   consider an incentive award.  But it's not clear what

17   Mr. Chenier did for the Realogy class.

18          He may have done substantial amounts, and I don't

19   know exactly what.  But he may have done something for the

20   proposed putative Mason-McDuffie class that didn't turn out.

21          But I don't know to what extent he did anything to

22   benefit the Realogy class or to add value or benefit to the

23   Realogy class, as such.

24          So I'm concerned about the legal basis for sort of

25   just shifting him, all his efforts, whatever they may be, on

1    behalf of a class that was not certified to a class that was

2    certified which is the Realogy class.

3            As to Mr. Lee, I really don't have any specific

4    showing as to what he did.  You sort of talk about Mr. Lee here

5    and there, and he sort of gets lost in the shuffle, by and

6    large.  And I don't think that's a mischaracterization of how I

7    read your discussion of Mr. Lee.

8            You know, a couple of times you mentioned Lee.  But

9    not anywhere with the specificity that perhaps you had talked

10   about certainly Mr. Attar, with his own declaration, or even

11   with some of the showing with respect to the Bergers and so

12   forth.

13           So there are two different issues here:  One, is a

14   legal issue as to Chenier and Attar; and the rest of it may be

15   a factual issue as to is there a sufficient showing for me to

16   properly assess, A, the propriety of incentive and, if so, the

17   amount of the incentive.

18           Now, if you want to be heard at this time on it, I'll

19   be more than happy to hear from you.  But what I'm inclined to

20   do is to ask you to give me further briefing on each of the

21   persons that you want an incentive, justifying specifically as

22   to each of them why they should get an incentive, why they

23   should get the incentive that you say they should get in light

24   of the factors that we have been able to glean from the various

25   cases including, of course, those things such as:

1          What benefit did they confer; what actions did they

2    take; what risk, harassment, oppression, suffering, risk,

3    losses that they have sustained, you know -- things of that

4    kind -- where I can actually rather than say, okay, you know,

5    give me a few pages of a deposition.  Okay.  That's something,

6    but I don't know how much time they spent.

7          You say some of them went to deposition.  Did all of

8    them do that?

9          MR. HIMMELSTEIN:  Yes, Your Honor.

10         THE COURT:  Was Mr. Lee deposed?

11         MR. HIMMELSTEIN:  Yes, they were all deposed.

12         THE COURT:  Okay.  And some of them were named -- all

13   of them were named as defendants in this, but my recollection

14   is that that was a declaratory relief action.

15         That wasn't something where somebody was saying "You

16   owe me money."  It just says -- which is kind of an odd

17   declaratory relief action, an insurer versus an insured that

18   includes these plaintiffs.

19         But be that as it may, you know, those are things

20   that, fine, I'll take all of that into consideration -- how

21   much time did they have to spend gathering up documents,

22   preparing for discovery; how much time did they have to travel

23   to San Francisco on mediation, bla, bla, bla.

24         I'm not saying things weren't done.  But I'm not sure

25   that I can sort of with the kind of more generalized showing

```
 1    just hocus-pocus say:  25,000 appears to be good to me; give

 2    them all 25,000 and besides, who cares, Mr. Himmelstein is

 3    paying for it, effectively.

 4           You know, that may be the practical result, but I

 5    can't get there without my analysis.

 6           MR. HIMMELSTEIN:  I understand Your Honor's concern

 7    and obligation to see that the law's followed regardless of who

 8    is paying for it.

 9           I would accept Your Honor's gracious invitation to

10    put supplemental briefing in on this point.  Since whatever

11    Your Honor awards would be coming out of the attorney's fees

12    pursuant to the agreement, I would hope the resolution of that

13    wouldn't necessarily delay approval of the settlement as a

14    whole.

15           THE COURT:  It would not.  I'm prepared today to hear

16    from everybody including Mr. Strong, who sat there very

17    patiently so far.  But I'm going to hear from him.

18           I have considered Mr. Palmer's objection even though

19    he's not here, even though he didn't properly file it.  But you

20    were kind enough to supply it and discuss it in your reply.

21           But after considering all of that, I'm prepared to

22    rule on the request for approval of the settlement, and I am

23    prepared to rule on the request for attorney's fees.  But there

24    are these things that I do want to have cleared up.

25           MR. HIMMELSTEIN:  Yes, Your Honor.  And I would like
```

1    the opportunity to provide supplemental briefing.

2            I would like to respond very briefly here.

3            THE COURT:  Of course.

4            MR. HIMMELSTEIN:  With respect to, let's take

5    Mr. Chenier, first, who's an easier call.

6            Obviously, personal characteristics are not strictly

7    relevant, but one should appreciate that Mr. Chenier reached

8    out to become a class representative in this case, volunteered

9    while on active military duty in connection with the war in

10   Iraq.  He's now a disabled, retired veteran; a man of

11   unquestioned integrity.

12           What did he do?  As Your Honor may recall, in the

13   early phase of this litigation beyond the focus on plaintiff's

14   counsel, most of the briefing had to do with equitable tolling

15   of the Statute of Limitations.

16           R.E.S.P.A. has a one-year statute.  If we can toll

17   the statute, we can go back quite a bit longer -- the damages

18   are increased; the class size is increased.  Many people who

19   would get money with an equitable tolling argument, successful,

20   would not get money -- most of the class would not get money

21   without the benefit of the equitable tolling if this case went

22   to trial.

23           The Bergers' transaction was outside of the one-year

24   R.E.S.P.A. Statute of Limitation; therefore, we had to invoke

25   the equitable tolling doctrine and succeed on that for that

```
 1    case to produce even a dime of recovery because, without

 2    succeeding on equitable tolling, the Bergers' claim is out;

 3    there's no class representative left as to the Realogy

 4    defendants.

 5          Mr. Chenier's transaction was important because he

 6    was within the one-year R.E.S.P.A. Statute of Limitations.

 7          Mr. Lee -- and we aired this fully in the class

 8    certification papers, especially the reply.  There was a debate

 9    over whether his transaction was within or outside the one-year

10    period.

11          I think we made a good argument that it's within the

12    one-year period.  I won't bore the Court with all those details

13    now.

14          What that did was -- and I can't speak for what's in

15    defendants' minds -- but instead of having a case which they

16    could knock out entirely on Statute of Limitations grounds with

17    the addition of Mr. Chenier and Mr. Lee, they could no longer

18    do that.

19          So they definitely added considerable value to the

20    class; and without their participation, I don't know that we

21    would be here today with any settlement at all.

22          With respect to Mr. Attar, I've read the Stanton

23    decision many times myself, trying to make sense of that

24    sentence and, obviously, put the best spin on it for my clients

25    which is my job.
```

```
 1            I don't know exactly what it means.  But it seemed to
 2   me to say that, if someone provides benefit to the class even
 3   though they're not a class member -- there was one plaintiff,
 4   which we quoted, which was found not to be a class member.  But
 5   they said:  Well, they can get paid for their services by the
 6   attorney.
 7            I interpreted that as being for their service as well
 8   as reimbursement of out-of-pocket expenses.  I understand the
 9   sentence is not exactly clear.
10            THE COURT:  But can you pay for somebody to stand in
11   the position of a proposed plaintiff.  That's effectively what
12   you're paying for.  Is that a compensable service?
13            MR. HIMMELSTEIN:  I understand and, Your Honor, I
14   reached the same philosophical Donnybrook in writing the brief.
15            I think that the law does permit us to look at
16   practicalities to some extent.  Without Mr. Attar, no RE/MAX
17   class would have been certified; Your Honor would have probably
18   dismissed the case against RE/MAX and none of those people
19   would get anything, as you did with Mason-McDuffie.
20            So it's clear that Mr. Attar put himself at risk.  We
21   justified the amount here, not really with regard to so much as
22   the time that people put in, but the risk they assumed.  And we
23   cited cases, several cases which say that incentive award is to
24   compensate not only for the time but the risk assumed.
25            THE COURT:  I understand.  I didn't mean to say one
```

```
 1   factor or the other is going to be controlling.  It isn't.
 2            I'm going to consider all of the factors that I've
 3   been able to get from the various cases and, you know, assemble
 4   maybe four, five, six of those factors that have been talked
 5   about in the various cases.
 6            And, you know, I'm not assigning particular weight or
 7   value to one factor versus another.  All I'm saying is that
 8   depending upon the circumstances of the case, certain factors
 9   obviously, will be more valuable in forming my decision than
10   others, and I appreciate that.
11            Some factors may not even be applicable.  But not all
12   factors, obviously, have to be present, you know.  So that's
13   what I was getting at.
14            MR. HIMMELSTEIN:  I understand Your Honor's concern
15   and the lack of at least clear precedent on the point.
16            I think that perhaps it is relevant that this is
17   being paid not at the classes' cost but out of our attorney's
18   fee award, which, without Mr. Attar's participation, I don't
19   think there would be any RE/MAX settlement at all.
20            Mr. Attar was -- the incentive award, it's called an
21   "incentive award" for a reason.  It's to incentivize people to
22   participate in class actions, to put themselves at risk -- in
23   this case, be named as a defendant in some insurance coverage
24   dispute -- which, you know, every time you fill out some long
25   credit report now, you're going to have to put down "Oh yeah, I
```

```
 1    was sued here" and then try to explain it to the loan officer.

 2              We think he's definitely earned it, and I think that

 3    there is enough of a basis in the law to allow the payment to

 4    go through.  But obviously that's for Your Honor to decide.

 5              I was not able to find any additional authorities

 6    that bear directly on the point, and the presentation we'll

 7    give Your Honor will be primarily factual.

 8              THE COURT:  Okay.  All right.

 9              At this point, Mr. Strong, why don't you approach the

10    lecturn.  You represent Mr. Alfi, and Mr. Alfi has filed an

11    objection.  Mr. Alfi is a member of the Realogy class; correct?

12              MR. STRONG:  Yes, Your Honor.

13              THE COURT:  All right.  So your objection will be

14    deemed to be directed only at the settlement as to the Realogy

15    class.  Obviously, you don't have any standing to object to any

16    other class at this time.

17              So I have here your objections.  I have considered

18    them.  If you have something to add, go ahead, but I wouldn't

19    wholesale repeat that which you have placed in writing.  But

20    I'll hear from you.

21              MR. STRONG:  Thank you, Your Honor.

22              Before I get into my brief argument, I'd like to

23    advise the Court there's a class member here who told me out in

24    the hall that she may wish to speak.  It was unclear to me

25    exactly what she wanted, but I just felt it was my duty to
```

1    mention it.

2             THE COURT:  Okay.

3             MR. STRONG:  Well, Your Honor, the reply brief did

4    not really deal with the arguments I raised, stating that our

5    primary authority was the bench book or handbook for Judges on

6    class actions.

7             There was no discussion of the case that we actually

8    cited, which was Sylvester v. CIGNA, 369 F. Supp. 2d 34 -- a

9    case in Maine in which the chief judge discusses extensively

10   the problems with reverter and a clear sailing or fair

11   sailing-agreements.

12            THE COURT:  Let me ask you this:  It's not clear to

13   me the facts.  There, the proposal was to pay the class $51.97.

14            What percentage of the amount actually paid out by

15   the plaintiff class did that represent?

16            MR. STRONG:  I'm not sure I can tell from the

17   published reports.

18            THE COURT:  I wasn't able to.  So I just wanted to

19   know because I want to make sure we're comparing apples and

20   apples and not apples and oranges.

21            MR. STRONG:  There was some adjustment. . . .

22            THE COURT:  It's unlikely they all paid $51.97 --

23   like in this case everybody either paid $99 or $114 -- because

24   those were medical services, and it's unlikely that they all

25   had the same medical service and they all paid $51.97 to the

```
 1    doctor for it.

 2              It seems unlikely.  But like I say, I don't really

 3    know, and it's not apparent from my reading of the case.  And I

 4    thought maybe you had other information that might be able to

 5    enlighten me on that.

 6              MR. STRONG:  No.  I'm afraid not, Your Honor.

 7              THE COURT:  Okay.  Go ahead.

 8              MR. STRONG:  The reply brief also contends that the

 9    Williams case is controlling as to the viability of the

10    reverter and the clear sailing agreement.

11              I would respectfully submit that it is not

12    controlling.  And there is recent authority which distinguishes

13    the Williams case, and that's Yeagley v. Wells Fargo, 2008 U.S.

14    District Lexis 5040, in which Judge Breyer in the Northern

15    District of California extensively discusses Williams and finds

16    that a case, which I see is very similar to this one, is

17    distinguishable and he does not follow Williams.

18              That case was not discussed in the reply papers.

19              I'd also like to mention the notice issue due to the

20    low number of claims.  Accepting the Court's estimate of maybe

21    sixty to 65,000, as mentioned a little earlier in this

22    proceeding, that means that there's about three hundred to

23    350,000 people that are not making claims, and I believe the

24    notice could have been --

25              THE COURT:  Unless you have some different numbers,
```

```
 1    my understanding, as represented by class counsel, is that
 2    there were maybe about 320 transactions that may involve
 3    330,000 individuals such as, you know -- in the case of the
 4    Bergers, for instance, that's one transaction, but they're
 5    husband and wife.
 6            But, effectively, you have 320 instances of a payment
 7    because Mr. and Mrs. Berger certainly didn't pay the disclosure
 8    fee twice because it's only one transaction.
 9            So the more accurate number is 320,000 of which, with
10    the kind of mailing that they've done, you know, we're talking
11    about if there's sixty, sixty-five, it's roughly 20 percent.
12            Right?
13            MR. STRONG:  Yes, Your Honor.
14            I guess my question is really why there was no e-mail
15    notice, no attempt to gather e-mail addresses and so on.
16            Many times I find it easier to contact people via
17    e-mail than by mail and many times they move but they keep the
18    same e-mail address.  And I think there must have been a lot of
19    e-mail addresses available, but there was no notice sent out.
20            And of course, the cost of emailing is minuscule.  So
21    it would have been an attempt to make the best practical
22    notice.  I think that should have been done, and I think it
23    would have increased the claim rate.
24            In fact, it's not too late for it to be done, and I
25    would respectfully request that some efforts be made at e-mail
```

1  notice before this is approved.

2          Finally, the Court has expressed some concerns about

3  the viability of the defendants, financial viability.  I don't

4  have any knowledge as to their financial status beyond what I

5  read in the press, but I did see a press report from the Inman

6  News Service which states that there was 10 million and

7  probably more insurance coverage involved in the settlement of

8  this case.

9          So there is a substantial amount of money which is

10 not coming out of the defendants, and I think that suggests

11 that there should be some cy pres remedy for the class members

12 who do not make a claim.  There should be some compensation to

13 them.

14          I suggested a couple of groups, which Mr. Himmelstein

15 suggested were not suitable; but there are certainly suitable

16 groups around.  And I would respectfully request on behalf of

17 Mr. Alfi that the settlement not be approved at this time, but

18 that it be sent back and some attempt be made to come up with a

19 cy pres remedy which benefits the housing interest of

20 California consumers.

21          THE COURT:  Thank you.

22          MR. STRONG:  Thank you, Your Honor.

23          THE COURT:  Is there a class member who's here?  All

24 right.  Come on up and state your name for the record, and tell

25 us that which you wish to bring to the Court's attention.

```
 1                MS. JONES:  My name is Jackie Jones.

 2                THE COURT:  I'm sorry.  Just a minute.  Your name is

 3     Jackie Jones?

 4                MS. JONES:  Uh-huh.

 5                THE COURT:  Which potential class -- which class are

 6     you a member of?

 7                MS. JONES:  I don't know.  That's because I had a

 8     stroke.  And at the time she sold my home, I thought she did it

 9     from her heart.

10                THE COURT:  Take your time.  Take your time.  No

11     problems.

12                MS. JONES:  And I couldn't talk or I couldn't write

13     or read.  So she sold it, and I thought she had done what's

14     right.  So I went there when I got the notice.  And I asked for

15     my file, but it's gone away now.  It's been so long, since

16     about 2001.

17                THE COURT:  Okay.

18                MS. JONES:  I just was notified.  I didn't know this

19     was going to occur, and so I just want to come to find out what

20     had happened.  And I don't know what happened or anything.  So

21     I'm just here to say it's wrong what they did.

22                THE COURT:  I'm not sure I fully understand.

23                Now, if you're saying you generally had a dispute

24     with your broker and you thought there was something to that

25     the broker did not properly represent you in your transaction,
```

1    that's not what we're really here for.

2            This is not a lawsuit involving, let's say, strictly

3    speaking, how brokers didn't find the best value for their

4    clients or find the best house or get the best amount of money

5    for a seller.  That's not what our class is about.

6            Our class is just about whether or not the amount

7    that was paid for a hazard disclosure statement, either $99 or

8    $114, whether or not there was a violation of a certain section

9    of federal law with respect to whether or not kickbacks, fee

10   splittings, and so forth, had occurred with respect to that

11   narrow part of the entire transaction.

12           This is not a case that talks about the entirety of

13   your transaction, your real estate transaction.

14           So I'm not sure whether, A, you are a member of any

15   of these classes because there are three classes of defendants

16   and I certainly don't believe that if your --

17           If your purpose is that you are generally unsatisfied

18   with what your real estate agent did for you or didn't do for

19   you, I'm not sure this is covered by our classes, any of the

20   classes.

21           MS. JONES:  Maybe it's not.  I'm just saying.

22           THE COURT:  Well, perhaps maybe what I can do is have

23   class counsel discuss this matter with Ms. Jones, and at least

24   try to find out whether or not she is a member of the

25   circumscribed classes that we are talking about.  And if she

```
1    is, perhaps, you can assist her in light of the circumstances
2    in ensuring that whatever proper claims that she may have would
3    be properly and timely asserted.
4             MR. HIMMELSTEIN:  Yes, Your Honor.  I spoke with
5    Ms. Jones in the hallway before the hearing.  She has a claim
6    form that was sent to her by the settlement administrator as
7    one of the so-called "mailed claim forms" which confirms her
8    class member status.  I've given her my card, and I'll help her
9    fill out the claim form right after the hearing.
10            THE COURT:  Do you know which class she's in?
11            MR. HIMMELSTEIN:  That I don't know.
12            MR. SPIERER:  Your Honor, I believe it was --
13            THE COURT:  Always stand up when you address the
14   Court, sir.  You know better than that.
15            MR. SPIERER:  Thank you, Your Honor.  I believe her
16   agent was with Coldwell Banker.
17            THE COURT:  So Coldwell Banker would be part of the
18   Realogy.
19            MR. HIMMELSTEIN:  Yes, Your Honor.
20            THE COURT:  Thank you very much.  Stay until we're
21   done.  Have a seat, and then Mr. Himmelstein will talk to you
22   some more.
23            MS. JONES:  Okay.  Thank you.
24            THE COURT:  Mr. Himmelstein, why don't you go ahead
25   and take a first shot at, if you care to, responding to what
```

1    Mr. Strong has just said, argued and then I'm going to give any

2    of the defendant counsel an opportunity to address anything,

3    should they care to do so.

4           MR. HIMMELSTEIN:  Thank you, Your Honor.

5           I don't understand Mr. Strong's comment that we did

6    not discuss the Sylvester case or the Pocket Guide for Judges

7    in our brief.  We spent a good part of eight pages discussing

8    the Pocket Guide and did discuss the Sylvester case.

9           There are basically two views:

10          The Eleventh Circuit, the Second Circuit, and the

11   Ninth Circuit say you calculate the fee based on the amount

12   made available to the class, and that's expressly stated in the

13   decisions;

14          And the Sylvester case, you know, goes the other way,

15   another judge has a different opinion.  It's not been adopted

16   by anyone.  There's a statement in there, there should be a

17   presumption of unreasonableness.

18          The Court in that case, Sylvester, itself, noted that

19   that standard had not been adopted or even proposed to the

20   First Circuit.  It is a stand-alone case, and we have Ninth

21   Circuit authority which is directly contrary.

22          With respect to the Yeagely case mentioned by

23   Mr. Strong, that was not in his papers.  It's a bit of an

24   ambush here.  I have looked at the case, and the opening

25   paragraph, third sentence is, quote:

1        *"The question presented is 'What is a reasonable*

2        *attorney's fee for a virtually worthless settlement of a*

3        *meritless case?'"* unquote.

4              Your Honor earlier said we need to be comparing

5    apples and apples and not apples and oranges.

6              I respectfully submit this is not a worthless

7    settlement.  There are about 50,000 people who are waiting for

8    their checks for about a hundred dollars apiece, and it's

9    certainly not a meritless case as H.U.D. itself, which is

10   charged with enforcing R.E.S.P.A., has found.

11             So comparing this case and <u>Yeagely</u> would be apples

12   and oranges.

13             With respect to what Mr. Strong contends are the low

14   number of claims, we've submitted a document by Rust

15   Consulting -- it's attached to my reply declaration -- showing

16   that the average range of claims in consumer settlements is

17   quite low compared to this.

18             This is at about 20 percent as Your Honor calculated,

19   at the extreme high end of the range already, and we would hope

20   additional claims will be submitted in the next two months.

21             We made this claims process as user friendly as

22   possible.  I have received really far less calls than usual

23   from class members having problems with this, and we have

24   50,000 claims.  And aside from Ms. Jones' issue, I have had no

25   complaints about difficulty filling out the claim form.

```
 1              With respect to e-mail notice, I have to wonder if
 2    Mr. Strong has really reviewed the papers we submitted in
 3    support of the settlement.  He says there must have been a lot
 4    of e-mail addresses available.  We didn't even have the names
 5    of class members or the street addresses when we started.
 6              If I had an e-mail list, as you do when you have
 7    settlements very often with high technology companies where
 8    people register online or whatever, we would have used them.
 9              We put up a website for the settlement.  We allowed
10    people to download and print and just sign the claim form.
11    We've used every device at our disposal to maximize the
12    submission and payment of valid claims.
13              We didn't have any e-mail addresses, and I don't know
14    how you go out and do it, get those in a reliable fashion.
15    Fortunately, the real property records provided a reliable
16    enough source of information that we were able to get names and
17    addresses to send people their claim forms.  But just to mass
18    e-mail people, inviting them to submit claims with no
19    confidence that any of the e-mail addresses were correct, would
20    have just been administrative chaos for no reason.
21              With respect to the cy pres component, as the Court
22    well knows, the deal is it can't be rewritten.  It can be
23    accepted or rejected; and you know, we could start all over in
24    mediation with Judge Cahill.
25              We set a record at JAMS I'm told.  We had nine
```

1    conference rooms going simultaneously, on and off for nine

2    months to get this deal.  And I don't believe we are going to

3    get a better deal.

4            As counsel for the class, my concern is primarily not

5    with benefiting unnamed charities but with benefiting the class

6    members.  And having gotten back every dime every one of them

7    spent who shows up to claim it, I feel we've done our job for

8    them; and it's reflected in basically the claims rate, the vote

9    in favor of the settlement.

10           I don't think class members, if you ask them, would

11   say "No, I don't want my $100 now.  I want maybe $100 later.

12   What I really want is for you to give a whole bunch of money to

13   charity that may benefit me or not at some point in the

14   future."

15           The class members want their money, and we would like

16   to give it to them.

17           THE COURT:  All right.  Thank you very much.

18           Any lawyers on the defendants' side of the table who

19   wish to be heard on any matters that we've already been

20   discussing or any matters that may be pertinent to the motions

21   currently pending before the Court?  Anyone?

22           Okay.  No one.  Very good.

23           The Court is prepared to make certain findings and

24   rulings.

25           First, let me take up the objections.  I only have

1    two objections before me, although one was not properly filed;

2    that is Mr. Palmer's objection.   Nevertheless, because I had a

3    copy of it through Mr. Himmelstein's filings, I will regard it

4    as an objection.   And I will, of course, address it.

5              With respect to Ms. Juana Peraza, it is unclear that

6    it was intended to be any kind of an objection whatsoever.   It

7    seems more likely that she just wanted to be a claimant.   And I

8    have directed class counsel to look into that matter and

9    that -- if that is what she wants and if she needs any

10   assistance in assuring that she files a timely, valid claim --

11   that he should do so.

12             So with respect to the two objections, we have one

13   from Mr. Alfi, who is represented by Mr. Strong who has been

14   given an opportunity to address the Court.

15             There are various components, it appears to me, from

16   Mr. Alfi's objection.   One is that because there is a

17   confluence of the so-called clear sailing provision with

18   respect to counsel's fees and the reverter, that it becomes a

19   hot-button indicator of unfairness and that, therefore, somehow

20   that should enform our assessment as to the fairness of this

21   particular settlement.

22             We have carefully considered this objection including

23   the Sylvester case that's been cited.   We are aware that, in

24   the Ninth Circuit, approval of settlements that have included

25   both the clear sailing and the reverter provisions have been

1    approved.

2           I'm not saying that the Williams case says that

3    because it has said that, that in every case where there are

4    those provisions, we must approve it.  That's not how I read

5    it, nor do I suspect that that's the point that class counsel

6    is asserting.

7           Nevertheless, it is very clear that even the presence

8    of those two components do not necessitate a per se rejection

9    of the settlement.

10          What is more important is that we look at what would

11   underlie our decision to not accept a settlement; that is, if

12   the reverter were accompanied by those circumstances where

13   either there were defects in the notice, such that it was aimed

14   at getting a disproportionately low number of claimants, so as

15   to increase the percentage of the reverter -- that would be a

16   problem -- or if there are also other restrictions or obstacles

17   that are not necessary to a fair and reasonable assessment of

18   legitimate claims.  Then we would also be concerned because

19   that, again, would be an artificial method used to depress the

20   number of valid claims to the benefit of the reverter.

21          I have carefully examined the notice provision.  I

22   have initially approved it.  And I have looked at it again.

23   It's been complied with, and I'm satisfied that this is the

24   most reasonable method and the method most likely calculated to

25   reach actual notice by the most number of claimants possible

1    under the circumstances.

2            Moreover, I have also carefully reviewed the

3    settlement agreement again, and there does not appear to me to

4    be any undue restrictions or obstacles that have been put in

5    the path of anybody who wants to file a legitimate claim.

6            To the extent requirements are made, they are

7    reasonably required to ensure that only legitimate claims are

8    made and not illegitimate claims.  So therefore, in this case,

9    given this settlement, the objection is overruled with respect

10   to its argument as it relates to the clear sailing and the

11   reverter components.

12           There is also an objection that the poverty is

13   suspect, that maybe there's some insurance that hasn't been

14   revealed and that there's insufficient evidence of financial

15   status.

16           That objection is also overruled because the

17   defendants' financial condition is only one of many factors to

18   consider in my determination of the fairness and reasonableness

19   and adequacy of the class settlement.

20           Insofar as insurance is concerned, it has been

21   discussed.  It was discussed with respect to the so-called

22   wasting away, melting ice cube -- however you want to call it

23   to characterize it -- the policy of Property I.D.

24           In this respect, the RE/MAX settlement does not

25   include a reverter, nor does the amount paid by Property I.D.

```
 1              But clearly, counsel has made a sufficient showing

 2     that with respect to the financial condition of RE/MAX and the

 3     circumstances as they relate to that particular class and that

 4     defendant, the need to follow up with additional, collateral

 5     litigation would be so burdensome and would be so fraught with

 6     risk, that it clearly demonstrates that RE/MAX certainly does

 7     not -- that the settlement as to the RE/MAX class is not

 8     defective because somehow the financial circumstances have

 9     either been overblown because I think they are adequately taken

10     into consideration and have properly done so.

11              There is another objection by Mr. Alfi, and that is

12     that determination of fees should take place after the amount

13     paid is known.  I assume that would only be relevant if we are

14     basing the fees on the amount actually claimed but not on the

15     total benefit created by the settlement for the potential

16     benefit of the class.

17              And I will address that as I address the

18     reasonableness of the settlement as well as the reasonableness

19     of the fee and the calculation of the fee.

20              Based upon those findings, which I will be making,

21     this objection is overruled in part;

22              To the extent that I have discussed with class

23     counsel that perhaps a portion of the fee -- not that it would

24     be denied, but it would be held back pending full resolution of

25     the contribution by the Realogy and the Pickford defendants
```

1  after the claims are filed, then to that extent, if that is

2  part of the objection, that objection is sustained.

3       Mr. Palmer is not here.  He has made certain

4  objections.  His objections that I can decipher are that the

5  attorney's fees should be paid in installments.  That objection

6  is overruled.

7       To the extent that, however, I am, as I said, likely

8  to delay payment of a portion of the award of fees that I will

9  grant.

10      His next objection is that the attorney's fees are

11 excessive, that 25 percent is excessive, and that he prefers

12 that we use the Lodestar and the multiplier.

13      Of course, that is not how we do things here in the

14 Ninth Circuit.  That may be what we do in state court.  I don't

15 know, but this is not a state court.  And so we are proceeding

16 under federal law, and I will discuss this in more detail

17 during the course of my award of the fees.

18      So to that extent, the objection is overruled.

19      And to the extent that he also objects, as Mr. Alfi

20 has, to the inclusion of a clear-sailing provision and a

21 reverter, the same ruling stands; and therefore, that objection

22 is also overruled.

23      Mr. Palmer, unlike Mr. Alfi, also asked for some sort

24 of incentive pay equal to the incentive pay of the other

25 proposed class representatives by reason of his objections.

1          While the Court is always glad to receive the views

2     of any objectors, having carefully considered Mr. Palmer's

3     objections, they do not add anything to my considered review of

4     this case.   Therefore, his request for any kind of an incentive

5     payment, whatever that payment may be, is rejected and denied.

6          Insofar as the settlement is concerned, I have to

7     review the settlement for fairness.

8          As Mr. Himmelstein said, it's not my job to say:

9     What's the best settlement?   It's not my job to say:   Could

10    there be a better settlement?   It's not my job to say:   If I

11    were class counsel, could I have negotiated a better

12    settlement?   All of that is neither here nor there.

13         My only question is whether or not the settlement

14    that's been reached is fair, adequate, and reasonable.

15         And in doing so, of course, we rely upon the very

16    familiar factors that will guide us including the strength of

17    the plaintiffs' case, the risk and expense and complexity and

18    the likely duration of further litigation in this case, the

19    risk of maintaining the class status throughout trial, the

20    amount offered in the settlement, the extent of the discovery

21    completed and the stage of the litigation and the proceedings,

22    the experience and views of counsel, the presence of any

23    government participant and its views, the reaction of the class

24    members to the proposed class.

25         There are, of course, three classes here.   And

1    although sometimes we have talked about it as if there's only

2    one class, there really are three classes.

3         However, in going through and assessing the

4    reasonableness of these classes, many factors apply across the

5    board.  Some do not.  To the extent that some do not and have

6    particular considerations, I will note those as we go along.

7         Insofar as the strengths of the case is concerned,

8    the plaintiff views the case as being strong.  But that doesn't

9    mean that because it's a strong case that settlement by its

10   terms is therefore unreasonable.  It is one factor to consider.

11        The risk, expense, and complexity of the case clearly

12   favors settlement of this case.  This case has been truly

13   expensive.  It's been heavily litigated.  It is complicated,

14   and it will threaten to be so should there not be a settlement

15   in this case.

16        There's always risk in every case, and particularly

17   in this case, with respect to certain interpretations of

18   statute.  Despite the fact that the Court had made certain

19   rulings with respect to that, of course, those rulings are not

20   free from challenge on appeal.

21        So there is always a risk continued litigation will

22   have over settlement.

23        Insofar as decertification risk is concerned, I do

24   find that that is relatively low in this case.

25        The amount of the settlement strongly favors approval

```
 1    in this case, despite the fact that Mr. Strong has suggested
 2    that perhaps even more money should be paid or that there
 3    should be no reverter or that certain payments should be made
 4    to various charities.
 5           As praise-worthy as those thoughts are, my assessment
 6    of this case is whether or not the amount of the settlement as
 7    currently agreed to favors approval -- and it clearly does
 8    because, unless there were to be an extraordinarily and largely
 9    heretofore unseen percentage of claims made as to the Realogy
10    and the Pickford class, everybody, even after all expenses and
11    fees, will more than very likely receive every cent that they
12    spent on this particular disclosure report -- either $99 or
13    $114.
14           It is true that there's a possibility at the end of
15    the day if this matter were to be tried that there might be
16    treble damages so that, theoretically, instead of $100 or $114,
17    it would be three times that.
18           But, nevertheless, in this case, the full return of
19    the money spent in addition to receiving the benefit conferred
20    by the report, which is not being taken back, strongly favors
21    settlement in this case.
22           With respect to the RE/MAX class, there is perhaps
23    more of a chance of payment of less than the full amount; but
24    even then, the rough estimate that class counsel and I have
25    figured out it appears to require a claim percentage of
```

1   somewhere around 35 and a half, 40 percent, whatever, something

2   of that kind.  And that seems to be extraordinarily high given

3   the experience of everybody, given these kinds of cases.

4       And so, again, it is extremely unlikely that there

5   will be any pro-rata sharing that will be required of the

6   RE/MAX class as to which there is no reverter, I should add.

7       So the settlement does allow the claimants to recover

8   the hard damages that they have paid out which is every cent

9   that they paid for this.

10      As the Circuit has stated:

11      *"The very essence of a settlement is compromise, a*

12      *yielding of absolutes and an abandonment of the highest*

13      *hopes.  While the highest hope may be treble damages, we*

14      *cannot expect a settlement to achieve what one would hope*

15      *to be able to achieve if one were to win fully at trial."*

16      The extent of the discovery completed; all discovery

17  has been completed.  And the stage of the proceedings are very

18  late in the process because only summary judgment motions and

19  then, if those fail, trial remain.

20      So this shows that the parties including class

21  counsel have had a full opportunity to fully understand the

22  strength, the weaknesses of the case, and be able to have a

23  fully informed discussion with opposing counsel with respect to

24  the settlement.

25      The experience and views of counsel favor settlement

1    in this case, and clearly class counsel are all very

2    experienced class action counsel and they expressed their views

3    that this is considered to be a home-run settlement.

4         There is no presence of a government participant,

5    technically, in this case.  But there is a related case where

6    the Secretary of Housing and Urban Development has filed an

7    action against certain of the defendants in this case and has

8    signaled approval of the proposed settlement in this case so as

9    to also sufficiently satisfy the concerns of the government.

10        The reaction of the class members to date strongly

11   favors acceptance and approval of this settlement; 45,000

12   people have filed claims.  Only 2 individuals have filed

13   objections, and I have addressed both of those.

14        Therefore, having considered all the relevant

15   factors, I find this settlement to be fair, adequate, and

16   reasonable; and I do approve the settlement.

17        Insofar as the fees and costs are concerned,

18   generally, we view the fees in a common-fund case such as this

19   on a percentage of the recovery.  And in this case, the

20   benchmark is 25 percent.

21        Now, it's clear that the benchmark doesn't mean that

22   it's inflexible or automatic.  We, of course, view the

23   benchmark in the totality of the circumstances of the case; and

24   we consider factors such as the results obtained for the class,

25   the risk to counsel, benefits of class members beyond the cash

1    and settlement, and the market rate.

2            Here we find and conclude that the results obtained

3    for the class favors a substantial award of fees.  Counsel

4    negotiated a very, very favorable settlement that provides in

5    very real terms 100-percent refund likely to all claimants

6    unless the number of claims exceed all reasonable forecasts and

7    expectations.

8            Counsel took a large risk in taking on this case

9    which also favors a strong percentage.  Other counsel have

10   tried unsuccessfully to bring similar type of lawsuits, but

11   counsel persisted in this case and has prevailed on a

12   substantial settlement.

13           There does not appear to be any benefits to the class

14   beyond the amount of the settlement.  However, we do note and

15   we have noted that the claimants have retained the benefit of

16   the purchased reports, while at the same time, pursuant to the

17   settlement, likely will receive full refund.

18           We, therefore, believe also a 25-percent award is at

19   or below market rates for services of the kind rendered by

20   class counsel.

21           Now, the next question is the percentage.  Even if I

22   approve 25 percent, what will that be 25 percent of.

23           First of all, with respect to the notice cost and so

24   forth, that will not be subtracted from the total potential

25   amount because clearly post-settlement notices and efforts of

1    that kind redound to the benefit of the class and the class

2    claimants; and that is certainly a benefit that's been

3    conferred and therefore they should be included.

4            I find, also conclude, that the entire potential

5    amount would be the amount against which the 25 percent will be

6    assessed less, of course, the costs of litigation, the $260,000

7    or so, that will be taken off the top.

8            It is appropriate that -- while Williams does not

9    dictate in every case, I find that in this case, given all the

10   factors and considerations I have set forth, that 25 percent of

11   the entire amount less the $360,000 of litigation cost is

12   appropriate in this case.

13           Insofar as the Lodestar cross-check, it is my

14   discretion as to whether or not to even conduct a Lodestar

15   cross-check.  But to the extent that I conduct one, there has

16   been a sufficient showing to me of the number of hours that

17   have been expended by counsel in this case and even if we were

18   to --

19           The Lodestar amount counsel claims is $3.8 million.

20   That would average out to about a blended rate of $390 per hour

21   for counsel, which I regard to be extremely reasonable.

22           This Lodestar yields a multiplier of about 2.5 if I

23   were to award a 25 percent.  And I find that 2.5 percent

24   multiplier -- given the complexity, the risks, the highly

25   favorable result in this case -- compares more than favorably

1    with other Lodestar multipliers that have been approved by the

2    Circuit in this case.  And I believe that this cross-check

3    confirms the reasonableness of the fee award of 25 percent as I

4    have discussed.

5              I have looked at the costs, and they appear to be

6    reasonable.

7              Insofar as the incentive for the various plaintiffs,

8    I have already directed counsel to submit further briefing.

9    And I will decline to, at this time, rule on and award any

10   particular amount with respect to the incentive payments.  I

11   will reserve that until such time as I receive further

12   briefing.

13             Mr. Himmelstein, how long will it take you to give me

14   the sort of briefing that I have directed you to give me with

15   respect to each of the individuals as to whom you think an

16   incentive payment ought to be made?

17             MR. HIMMELSTEIN:  Thank you, Your Honor.  Since I

18   don't know exactly the class reps' schedules and obviously I

19   need to communicate with all of them regarding this, would two

20   weeks be acceptable?

21             THE COURT:  That's fine.  Make sure you submit that

22   in two weeks.

23             I will, therefore, approve the cost amount that has

24   been sought which will come off the top and then a 25-percent

25   assessment of the remaining amount for attorney's fees.  Any

1   payment for incentive, the payment will eventually come from

2   the attorney's fees, not in addition to the attorney's fees.

3             And I will also take a closer look as to what

4   percentage I will direct that the claims administrator will not

5   be able to pay to counsel at this time but will hold back

6   pending final accounting and payment.

7             I haven't really fixed on a percentage as to that,

8   but I will take a closer look at that.  And I will issue an

9   order as to what percentage of the awarded fee will be withheld

10  until final accounting.

11            All right.  That's the Court's ruling.

12            Anything further as far as the plaintiffs are

13  concerned?

14            MR. HIMMELSTEIN:  No, Your Honor.

15            I'd just like to say it's been an honor and privilege

16  to appear before you these past few years.  Your Honor has kept

17  us all on our toes, and I just appreciate the opportunity for

18  the hearing today.

19            THE COURT:  Thank you, very much.

20            Mr. Strong, anything further.

21            MR. STRONG:  No, Your Honor.  Except I'd like to

22  second Mr. Himmelstein's concept.  It's the first time I've

23  appeared down here, but it's been a pleasure.

24            THE COURT:  All right.  Thank you.  Anything further

25  on any of the defendants' parts?

1              Thank you very much, Counsel.

2              Those are the orders.

3                   (Proceedings conclude.)

4                        --oOo--

5

6                     CERTIFICATE

7

8         I hereby certify that pursuant to Section 753,

9    Title 28, United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the

13   regulations of the Judicial Conference of the United States.

14

15   Dated June 24, 2009.

16                     s/ Mary Riordan Rickey

17                   OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25